# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3155 | **DATE** | 3/15/2001 |
| **CASE TITLE** | ANDREW A. SKOLNICK vs. CORRECTIONAL MEDICAL SERVICES | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment (29-1) is granted and Plaintiff's motion to strike defendants' response to Plaintiff's Local Rule 56.1(b)(3) responsive statement of facts (45-1) is denied..

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | | |
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | MAR 16 2001 | | |
| | Notified counsel by telephone. | | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | MAR 16 2001 | | |
| EF | courtroom deputy's initials | | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREW A. SKOLNICK,                    )
                                       )
                Plaintiff,             )
                                       )        No. 99 C 3155
        vs.                            )
                                       )        HONORABLE CHARLES R. NORGLE
CORRECTIONAL MEDICAL                   )
SERVICES, Inc.; SPECTRUM               )
HEALTHCARE SERVICES, Inc.;             )
RICHARD H. MILES; LOUIS                )
C. TRIPOLI; IMAGING DIAGNOSTIC         )
SYSTEMS, Inc.; RICHARD J. GRABLE,      )
                                       )
                                       )
                Defendants.            )

DOCKETED

MAR 16 2001

**OPINION AND ORDER**

CHARLES R. NORGLE, SR. District Judge

Before the court are: (1) the motion of Defendants, Correctional Medical Services ("CMS"),

Spectrum Healthcare Services, Richard Miles, and Louis Tripoli,[1] for summary judgment on

Plaintiff's claims of defamation per se [29-1]; and (2) Plaintiff's motion to strike Defendants'

response to Plaintiff's Local Rule 56.1(b)(3) responsive statement of facts [45-1]. For the following

reasons, Defendants' motion for summary judgment is granted and Plaintiff's motion to strike is

denied as moot.

---

[1]Where appropriate, the court refers to these Defendants collectively as the "CMS
Defendants," or simply as "Defendants." Plaintiff has dismissed Imaging Diagnostic Systems and
Richard Grable from this suit.

# I.  BACKGROUND

The short version of this diversity case is that Plaintiff, Andrew Skolnick, is an investigative journalist who wrote or contributed to several articles that were critical of healthcare in prisons in general, and of CMS in particular. The CMS Defendants, in turn, made several written responses to these articles. Not to be outdone in this water pressure contest, Skolnick sued the CMS Defendants, claiming that their responses defamed him and interfered with his business interests. Many of the underlying facts are disputed, but the material ones are not.

From November 1987 until November 1998, Skolnick was an associate editor for the Journal of the American Medical Association ("JAMA"). Skolnick's primary job at JAMA was to write approximately twenty-four stories per year for the "Medical News and Perspectives" section of JAMA. In 1997, upon the recommendation of his editor at JAMA, Marcia Goldsmith, Skolnick was selected as a Rosalynn Carter Fellow for Mental Health Journalism. As a Rosalynn Carter Fellow, Skolnick was to investigate and submit articles about medical and mental health issues in prisons.

The CMS Defendants are engaged in the business of providing prison healthcare services. In 1998, Skolnick began investigating the practices of CMS and allegations of its use of impaired or disciplined physicians in prisons. During his investigation, Skolnick consistently identified himself to CMS as an associate editor for JAMA and a Rosalynn Carter fellow. Skolnick claims he also told CMS he was working for other publications, but admits he did not identify any such publication. By mid-August 1998, Skolnick ended his communications with CMS.

Based on his research, Skolnick wrote two articles for JAMA: "Prison Deaths Spotlight How Boards Handle Impaired, Disciplined Physicians;" and "Critics Denounce Staffing Jails and Prisons

With Physicians Convicted of Misconduct" (hereinafter the "JAMA articles"). JAMA planned to

publish these articles in September 1998, but delayed publication until its October 28, 1998 issue.

In mid-August 1998, reporters William Allen and Kim Bell of the St. Louis Post-Dispatch

asked Skolnick to assist them in completing a special report on prison healthcare. Using personal

time, Skolnick went to St. Louis on September 12, 1998 to contribute to the report. Skolnick, along

with Allen and Bell, wrote or contributed to three articles that were published in the September 27,

1998 edition of the paper: "Physicians with troubled pasts have found work behind bars;" "Two key

posts in Alabama were filled by doctors with checkered histories;" and "Prisoner, doctor who treated

him, both had drug arrests" (hereinafter the "Post-Dispatch articles"). The Post-Dispatch articles,

which were critical of CMS, identified Skolnick as an author, special contributor, and Rosalynn

Carter Fellow.

After publication of the Post-Dispatch articles, CMS became aware that JAMA was planning

to publish the JAMA articles. On October 26, 1998, the chief medical officer of CMS, Louis Tripoli,

wrote the following letter to the chief editor of JAMA:

> I am the Chief Medical Officer at Correctional Medical Services, Inc., the
> nation's leading provider of healthcare services in correctional facilities, and
> have been a loyal member of the AMA for my entire professional career. It
> has come to our attention that JAMA's October 28, 1998 edition contains
> articles regarding the provision of medical services by our company. If that
> is the case, CMS requests the opportunity to provide further input and
> respond to any assertions to be made regarding our company and medical
> practices.
>
> We make this request for three reasons. *First,* we have reason to believe that
> much of the background "facts" and assertions recently provided to
> journalists regarding CMS have been provided by plaintiff lawyers adverse
> to CMS as part of a campaign seeking to advance their litigation and financial
> interest by generating unfair and negative publicity regarding CMS and its
> healthcare professionals, many of whom are also AMA members. We are

3

aware that plaintiff lawyers adverse to CMS have provided information to Andrew Skolnick of JAMA. We are certain that JAMA would not wish to be used by persons with ulterior agendas as a vehicle for the publication of inaccurate assertions regarding healthcare professionals.

*Second,* we have reason to believe that many of the assertions regarding CMS that may be published in JAMA have resulted from an "investigation" that included the use of questionable reporting tactics. Specifically, Andrew Skolnick repeatedly used the name of JAMA and, by implication the American Medical Association's reputation, when gathering information. However, Mr. Skolnick's stories <u>first</u> appeared, with his byline, in the *St. Louis Post-Dispatch* (September 27). Mr. Skolnick <u>never</u> mentioned to us that he was working on behalf of the *Post-Dispatch*. We trust that JAMA would not condone or reward the misleading use of the AMA's name. We would like the opportunity to discuss these issues with you further prior to any publication of assertions regarding CMS business or medical practices.

*Third,* our reputation as a healthcare provider and the reputations of the healthcare professionals who work for us are of central concern to us. The publication of inaccurate assertions could result in substantial personal and financial damage to the parties involved. We believe that standards of professional responsibility and courtesy between medical doctors and healthcare professionals warrant the opportunity for us to reply and respond to any purportedly negative factual assertions regarding our practices prior to publication. We also believe that the separate journalistic standards of fairness, balance and accuracy require such an opportunity.

Accordingly, we request that prior to the publication of any assertions regarding CMS by JAMA, we be provided with an opportunity to be heard and to respond to any assertions regarding our company. We have no doubt that JAMA will provide us with that opportunity. Please feel free to call me directly with any questions. I look forward to hearing from you.

(Def.'s Local Rule 56.1 Ex.10.)

On November 3, 1998, JAMA fired Skolnick. JAMA wrote a memo stating that Skolnick was terminated, in part, for contributing to the Post-Dispatch articles without informing his supervisor. Skolnick disputes this, claiming that JAMA allows its reporters to write about medical

issues for non-medical publications. Skolnick alleges that the real reason JAMA fired him was negative reaction to the Post-Dispatch articles.

On November 20, 1998, Thomas Yanucci, an attorney representing CMS, sent a twenty-one page letter about the Post-Dispatch articles to the managing editor of the St. Louis Post-Dispatch. Yanucci's letter stated, in relevant part:

> **IV.    The Newsgathering Tactics Employed by the Reporters Cast Considerable Doubt On Their Objectivity And Fairness And Establish Malice Toward CMS.**
>
> The reporters involved in the publication of the special report have employed tactics that have been repeatedly condemned by responsible media. Each of these actions is independent evidence of malice towards CMS, warranting serious reevaluation of the entire piece and proper steps going forward to guarantee fair treatment of CMS.
>
> **Failure to disclose reporter's identity**. On February 27, 1998, CMS Communications Director Susan Adams received a telephone call from Andrew Skolnick. Introducing himself, Mr. Skolnick stated that he was working for the Journal of the American Medical Association ("JAMA"). Mr. Skolnick told Ms. Adams that he was working on an article for JAMA.
>
> Based on Mr. Skolnick's representations, Ms. Adams agreed to meet Mr. Skolnick in Alabama and provide him with access to various facilities at which CMS provides healthcare services. During that meeting and tour of CMS facilities, Mr. Skolnick presented a business card identifying himself as the "Associate Editor" of JAMA. At no time did Mr. Skolnick inform Ms. Adams – or anyone else at CMS – that he was writing for or affiliated in any way with the *St. Louis Post-Dispatch*. CMS did not learn that Mr. Skolnick was writing for the *St. Louis Post-Dispatch* until his articles appeared in the September 27, 1998 edition of the paper.
>
> CMS disagrees with your assertion that Mr. Skolnick "was completely up front" with CMS because CMS was aware of the "issues" he was working on. JAMA certainly did not think that Mr. Skolnick was "up front" about its role in the preparation of the special section; it terminated Mr. Skolnick's employment shortly after his role in the special report was brought to light. Mr. Skolnick deliberately withheld the fact that – in addition to writing JAMA – he was sharing information with the *Post-Dispatch* reporters and

contributing stories to their special report. There can be no good reason for withholding this information from CMS. Such deliberately deceptive conduct is further evidence of malice and bad faith toward CMS, the common target of Mr. Skolnick and the *Post-Dispatch's* journalistic efforts. There can be no justification for a reporter deliberately misleading the subject of a story.

While the editors and management at the *Post-Dispatch* have largely ignored CMS's concerns, other publishers *have* responded to CMS's concerns. During both of your meetings, Mr. Miles explained how Andrew Skolnick – a contributing author whose articles appeared in your paper "[s]pecial to the *Post-Dispatch*" – told CMS employees that he was working on an article for the Journal of American Medicine ("JAMA") when in fact he was writing for the *Post-Dispatch*. Mr. Miles pointed out the serious issues raised by a reporter misrepresenting his identity to the subject of a story. When CMS raised these issues with JAMA, it took immediate corrective action. Confronted with the same facts about Mr. Skolnick's conduct and his role in the preparation of the special report, JAMA immediately terminated his employment. The fact that JAMA – a third party that has no vested interest in defending the special report – took such decisive action validates CMS's concerns about the newsgathering process employed by the *Post-Dispatch* and casts serious doubt on the supervision of the reporters involved in the preparation of the special report.

By this letter, we are putting you – and the *Post-Dispatch* – on further notice that CMS views Mr. Skolnick's conduct as dishonest, fraudulent and deceitful. We repeat our request that the *Post-Dispatch* clearly instruct all of its reporters, correspondents and contributing authors to clearly identify themselves as working for the *Post-Dispatch*, when contacting CMS and its employees.

(Def.'s Local Rule 56.1 Ex. 14, pp. 15-16.)

On March 15, 1999, Defendant Richard Miles sent a package of materials to Jim Whittum, a judge in the Missouri Associated Press Managing Editors News Writing Contest, in which the Post-Dispatch articles were entered. Miles' cover letter stated that the enclosed materials would demonstrate that the Post-Dispatch articles fell below the contest's journalistic standards for excellence. One of the enclosures was CMS' eighteen page response to the Post-Dispatch articles, which contained the following:

Allegation [from the Post-Dispatch articles]: *"An internationally renowned expert on forensic medicine and pathology from the University of Chicago called that report a 'whitewash' and said Moore's death was 'a homicide resulting from criminal negligence.'" (Allegation references documents in the death of Calvin Moore.)*

[CMS' response]: *False*. The article does not reveal that the physician cited, Dr. Robert Kirschner, was paid to be an expert witness for the plaintiff in this case. In contrast, the coroner's autopsy - which stated that the inmate's death was from *natural causes* - was performed by an independent state medical officer, who was NOT paid by either side to be a professional witness. The newspaper failed to mention these critical facts.

. . . .

Allegation [from the Post-Dispatch articles]: *"Diseases don't respect bars. Each year in the United States, 12 million inmates return to society, bringing with them a broad range of diseases that are often infectious."*

. . . .

[CMS' response]: The *Post-Dispatch* attempts to alarm readers by reporting that "12 million inmates return to society" each year. However, it is critical to note that, in the same article, the *Post-Dispatch* also reports that the nation's federal, state, and local criminal justice systems house approximately 1.7 million inmates. This contradiction evidences the *Post-Dispatch's* selective, arbitrary, and illogical use of facts.

. . . .

[CMS' summary of the Post-Dispatch articles]: The reporters' thesis is flawed, their statements are inaccurate, and the tone is sensationalistic. In short, their articles do a terrible disservice to the physicians, nurses, and other healthcare professionals who care for inmate patients in extremely difficult and challenging environments. They are dedicated and hardworking people who do not deserve to be vilified by reporters who disregard the truth in pursuit of journalistic accolades. While these healthcare professionals have been unjustly maligned, the truth is the real victim.

(Def.'s Local Rule 56.1 Ex. 12(A)(V) pp. 14, 18, 19.)

On May 12, 1999, Skolnick filed suit for tortious interference with prospective economic advantage under Illinois law. Skolnick later amended his complaint to allege that the above quoted material from the Tripoli, Yanucci, and Miles letters is defamatory per se under Illinois law. The CMS Defendants moved for summary judgment on all claims, and moved to stay discovery during the briefing. The court granted the motion to stay discovery, and limited the parties' briefing to the defamation per se claims.

Thus, the primary issue before the court is whether the three letters defamed Skolnick under Illinois law. Defendants argue that the quoted material is not defamatory per se, is capable of an innocent construction, and is non-actionable opinion. Skolnick agrees that Illinois law governs this dispute, but takes the opposite view on all other legal issues.

## II. DISCUSSION

### A. Motion to Strike

Local Rule 56.1 outlines the procedure for presenting facts in support of, and in opposition to, motions for summary judgment. Skolnick did not originally file a Local Rule 56.1(b)(3) response with his brief in opposition to the summary judgment motion. The court granted him leave to file an untimely 56.1(b)(3) response, in which he did not raise any additional facts. Defendants filed a response thereto, which Skolnick moves to strike.

The points Skolnick raises in his motion to strike are well taken. Defendants' response to his 56.1(b)(3) statement was unnecessary and improper. Nevertheless, the court did not consider Defendants' response in ruling on the summary judgment motion. Accordingly, Skolnick's motion to strike is denied as moot. That said, the court turns to the motion for summary judgment.

## B.  Standards for summary judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Illinois law, the issues presented in this case, defamation per se, the innocent construction doctrine, and statements of opinion, are questions of law that are properly decided by the court. See Bryson v. News America Publications, Inc., 672 N.E.2d 1207, 1215 (Ill. 1996) (whether statement is capable of innocent construction is a question of law); Moriarty v. Greene, 732 N.E.2d 730, 740 (Ill. App. Ct. 2000) (whether statement is protected opinion is a question of law); Miller v. Danville Elks Lodge 332, 569 N.E.2d 1160, 1164 (Ill. App. Ct. 1991) (whether statement is defamatory per se is a question of law).

## C.  Defamation per se

The court first discusses the law of defamation, and then analyzes each of the letters. Defamation allows a person to recover for harm to his or her reputation caused by false allegations of fact. Hopewell v. Vitullo, 701 N.E.2d 99, 102 (Ill. App. Ct. 1998). "A statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with her." Bryson, 672 N.E.2d at 1214. "To prove a claim of defamation, a plaintiff must show that the defendant made a false statement concerning plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by defendant, and that plaintiff was damaged." Dubinsky v. United Airlines Master Exec. Council, 708 N.E.2d 441, 446-47 (Ill. App. Ct. 1999).

"Defamatory statements may be actionable per se or actionable per quod." Id.; see also Pope v. Chronicle Publishing Co., 95 F.3d 607, 613 (7th Cir. 1996) (analyzing Illinois law). "A

publication is defamatory per se if it is so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary and extrinsic facts are not needed to explain it." Dubinsky, 708 N.E.2d at 447. By contrast, "[a] claim for defamation per quod requires the plaintiff to allege both extrinsic facts to establish that the statement is defamatory and special damages with particularity." Id. In this case, Skolnick is proceeding solely on a theory of defamation per se.

Illinois common law recognizes four categories of defamation per se: "(1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment; or (4) words that prejudice a party, or impute a lack of ability, in his or her trade." Bryson, 672 N.E.2d at 1214-15. Skolnick focuses on the third and fourth categories, claiming that the Tripoli, Miles and Yanucci letters falsely impute that Skolnick lacks integrity as a journalist, and prejudice him in his occupation.

Illinois law recognizes several defenses to defamation liability, two of which are at issue in this case - the innocent construction doctrine and expressions of opinion.

### 1.   Innocent Construction:

"Even if a statement falls into one of the recognized categories of words that are actionable per se, it will not be found actionable per se if it is reasonably capable of an innocent construction." Bryson, 672 N.E.2d at 1215. The innocent construction rule requires the court to interpret the alleged defamation in context and give the words their natural and obvious implications and meanings. Id. If, as so construed, "a statement 'may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff, it cannot be actionable per

10

se.'" Id. (quoting Chapski v. Copley Press, 442 N.E.2d 195, 199 (Ill. 1982)). There is no balancing of reasonable constructions. Dubinsky, 708 N.E.2d at 447. If a statement taken in context is reasonably capable of a non-defamatory interpretation, the court should so construe it. Id. This higher standard is necessary because of the presumption of damages in per se actions. Id.

An offshoot of the innocent construction rule is that the court should, if the context permits, limit statements about the plaintiff to a particular setting or single instance, so that the statements do not generally impugn the plaintiff's fitness for his or her chosen occupation. Anderson v. Vanden Dorpel, 667 N.E.2d 1296, 1302-03 (Ill. 1996); Dunlap v. Alcuin Montessori School, 698 N.E.2d 574, 581 (Ill. App. Ct. 1998). But, the Illinois Supreme Court has made it clear that the focus of the inquiry is on the context of the alleged defamation, rather than a simple determination of whether the defamation relates to a single instance. Costello v. Capital Cities Communication, Inc., 532 N.E.2d 790, 795-96 (Ill. 1988). A statement is actionable if, when taken in context, it generally impugns a person's fitness for his or her profession, even if the statement is limited to a particular setting or single instance. See id. (finding a statement directed to a single instance actionable because it generally impugned the plaintiff's fitness for office); compare Anderson, 667 N.E.2d at 1302-03 (finding an innocent construction for statements made in reference to the plaintiff's past performance in a single position, so that the statements did not pertain to the plaintiff's general fitness for a different employer).

**2. Protected Opinion:**

There is an obvious tension between freedom of speech and defamation. See e.g. Sullivan v. Conway, 157 F.3d 1092, 1098 (7th Cir. 1998) (noting how defamation suits can inhibit "the free and frank exchange of ideas, facts, and opinions. . . ."); Haynes v. Alfred A. Knopf, Inc., 8 F.3d

11

1222, 1224 (7th Cir. 1993) (analyzing "difficult issues at the intersection of tort law and freedom of the press."). Therein lies the irony. Skolnick, being an investigative journalist, is the last person one would expect as a plaintiff in a defamation case. His very livelihood depends on the free and frank exchange of facts and ideas. For him to wish to stifle the exchange of facts and ideas on prison healthcare is puzzling, especially where his work represents only one view of the subject, and has stimulated public debate on the topic. See Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J. dissenting) ("But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas - that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.").

Based on the first amendment to the United States constitution, Illinois law does not impose liability for expressions of opinion that may be considered defamatory per se and are incapable of an innocent construction. See Bryson, 672 N.E.2d at 1219-20 (analyzing Milkovich v. Lorain Journal Co., 497 U.S. 1, 10-23 (1990)). Illinois law on the issue of fact versus opinion largely follows federal constitutional principles. Nevertheless, the analysis begins, and in this case ends, with Illinois law rather than federal constitutional law. As Judge Easterbrook has explained, the court should examine whether state law imposes liability for defamation before venturing into the complexities of federal constitutional defenses to such liability. Underwager v. Salter, 22 F.3d 730, 733 (7th Cir. 1994) (limiting actual malice analysis to Wisconsin law); see also Wilkow v. Forbes, Inc., – F.3d –, –, 2001 WL 166709, at *3 (7th Cir. Feb. 20, 2001) (limiting fact/opinion analysis to Illinois law).

12

The parties do not raise the issues of whether Skolnick is a public figure or the CMS Defendants spoke on matters of public concern. See Milkovich, 497 U.S. at 22 (holding that where the plaintiff is a private figure, but the allegation of defamation is connected to a matter of public concern, liability requires some level of fault as defined in Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)); cf. Dilworth v. Dudley, 75 F.3d 307, 309 (7th Cir. 1996) (analyzing Wisconsin law, but noting that "[b]y publishing your view you invite public criticism and rebuttal; you enter voluntarily into one of the submarkets of ideas and opinions and consent therefore to the rough competition of the marketplace."). The parties do not raise these issues, so the court does not address them further.

The Illinois test to determine whether a statement is non-actionable opinion is a narrow one. Expressions of opinion are protected only when they cannot reasonably be interpreted as stating actual facts about the plaintiff. See Bryson, 672 N.E.2d at 1219-20 (discussing Milkovich, 497 U.S. at 20); see also Restatement (Second) of Torts § 566 (1977) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."). Illinois courts have used a couple of different tests to analyze the issue. The predominant test is based on Ollman v. Evans, 750 F.2d 970 (D.C. Cir. 1984), and consists of four factors: "(1) the precision of the statement; (2) the verifiability of the statement; (3) literary context of the statement; and (4) public and social contexts of the statement." Moriarty, 732 N.E.2d at 740 (citing cases). A slightly different three part test was announced in Hopewell, where the court stated:

> First, we consider whether the language of the statement has a precise and readily understood meaning, while bearing in mind that the first amendment protects overly loose, figurative, rhetorical, or hyperbolic language, which negates the impression that the statement actually presents facts. . . . Second, we consider whether the general tenor of the context in which the statement

appears negates the impression that the statement has factual content. . . . Lastly we consider whether the statement is susceptible of being objectively verified as true or false. . . . While this approach considers the context within which the alleged defamatory statement appears, its emphasis is on whether the statement contains an objectively verifiable assertion.

Hopewell, 701 N.E.2d at 103-04 (collecting authority, internal citations omitted).

Neither of these tests is a hard and fast analysis. The emphasis is on the totality of the circumstances, and whether the statement can be reasonably interpreted as stating actual facts or objectively verified as true or false. See Wynne v. Loyola Univ. of Chicago, 741 N.E.2d 669, 676 (Ill. App. Ct. 2000) (citing Hopewell, 701 N.E.2d at 103-04); Moriarty, 732 N.E.2d at 740 (citing Ollman, 750 F.2d 970); Gardner v. Senior Living Systems, Inc., 731 N.E.2d 350, 355 (Ill. App. Ct. 2000) (citing Bryson, 672 N.E.2d at 1220); Dubinsky, 708 N.E.2d at 448; Doherty v. Kahn, 682 N.E.2d 163, 172 (Ill. App. Ct. 1997) (citing Piersall v. SportsVision of Chicago, 595 N.E.2d 103, 107 (Ill. App. Ct. 1992)). If a statement contains objectively verifiable facts, the question of whether the facts are true or not is normally reserved for the jury. Bryson, 672 N.E.2d at 1220. But, if there's no dispute over their truth or falsity, the court can decide the issue as a matter of law. See Wynne, 741 N.E.2d at 675-76 (citing Hollymatic Corp. v. Daniels Food Equip., Inc., 39 F. Supp. 2d 1115, 1118 (N.D. Ill. 1999)). To the extent a statement consists of both verifiable facts and expressions of opinion, the defamation claim fails if the facts are true. See Wynne, 741 N.E.2d at 676 (holding that summary judgment for the defendant was proper where the plaintiff admitted the underlying facts that formed the basis for the defendant's opinion); compare Moriarity, 732 N.E.2d at 740 (holding that the plaintiff stated a claim for defamation by alleging that the defendant falsely attributed an admission to the plaintiff).

14

It bears emphasis that one cannot avoid liability merely by couching a defamatory statement as an opinion. See Wilkow, – F.3d at –, 2001 WL 166709 at *3 (citing cases). With these principles in mind, the court examines Skolnick's claims.

## D.   Skolnick's Allegations of Defamation:

Skolnick claims that each of the Tripoli, Miles and Yanucci letters is defamatory per se. The two common threads of Skolnick's allegations are: (1) that the letters falsely state that Skolnick misrepresented himself as working solely for JAMA when he contacted CMS; and (2) that the letters falsely state that Skolnick's reporting of facts in the Post-Dispatch articles was inaccurate. The net effect of both points, according to Skolnick, is that Defendants falsely impute that he lacks skill and integrity as a journalist.

At this point, the court addresses a curious statement in Defendants' opening brief. Defendants state: "For the purposes of this Motion only, [Defendants] are not addressing Skolnick's allegations that they intended to harm him; or that the Tripoli, Miles and Yanucci letter contain false statements." (Defs.' memo. p. 3.) Skolnick jumps on this statement as an admission that the letters contain false statements of fact, which dooms Defendants' innocent construction and opinion arguments. The court does not agree. The statement does not go as far as Skolnick claims. Indeed, Defendants argue, and Skolnick admits, that the material facts stated in the letters - Skolnick telling CMS that he worked for JAMA - are true. (See discussion infra at pp. 15-17; see also Pl.'s Local Rule 56.1(b)(3) Resp. ¶ 27.) Thus, Defendants' statement is of no moment.

### 1.   The Yanucci Letter:.

The court first addresses the Yanucci letter because it contains the harshest and most specific criticism of Skolnick. (See supra pp. 5-6 for the relevant text of the Yanucci letter.) According to

Skolnick, Yanucci's letter falsely asserts that Skolnick deliberately misled CMS about where his work would appear. Thus, Skolnick argues that the following statements from Yanucci's letter are defamatory: (1) Skolnick "employed tactics that have been repeatedly condemned by responsible media," (2) Skolnick "deliberately withheld the fact that - in addition to writing for JAMA - he was sharing information with the Post-Dispatch. . . ; (3) Skolnick's "deliberately deceptive conduct is further evidence of malice and bad faith toward CMS;" (4) Skolnick "misrepresent[ed] his identity to the subject of a story;" and (5) that "CMS views Skolnick's conduct as dishonest, fraudulent and deceitful." Defendants argue, and the court agrees, that these statements are non-actionable expressions of opinion.

As a preliminary matter, the prefatory language of "CMS views" does not by itself render Yanucci's letter non-actionable. See Wilkow, – F.3d at –, 2001 WL 166709 at * 3. That issue aside, the primary question is whether the court can reasonably interpret Yanucci's letter as stating actual facts or objectively verify the statements, while keeping in mind that true statements of fact are not actionable. Gardner, 731 N.E.2d at 355; Hopewell, 701 N.E.2d at 103-04; Wynne, 741 N.E.2d at 675-76; Moriarty, 732 N.E.2d at 740. The Yanucci letter contains an assertion of verifiable fact, i.e., that Skolnick identified himself as working for JAMA rather than the Post-Dispatch at the time he contacted CMS. This fact is true, and any expression of opinion based on it is not actionable. See Wynne, 741 N.E.2d at 675-76; Moriarity, 732 N.E.2d at 740. Yanucci's letter does nothing more than express CMS' displeasure with seeing Skolnick named as an author and contributor to the Post-Dispatch articles after he told CMS he worked for JAMA. CMS is entitled to form an opinion about that fact without incurring liability. See Wynne, 741 N.E.2d at 676; Moriarity, 732 N.E.2d at 739-40.

16

Skolnick claims he told CMS that he worked for other publications, so he argues that Yanucci's statements about Skolnick deliberately misleading CMS are false. Skolnick, however, admits he did not mention the names of any other publications to CMS. And, accepting the "other publications" statement as true does not change the outcome. Yanucci's letter is specific to the fact that Skolnick did not mention the Post-Dispatch when he was investigating CMS. Cf. Wynne, 741 N.E.2d at 675-76 (noting that "substantial truth" is a defense to defamation). The somewhat vague reference to "other publications" does not take away CMS' right to comment on the facts it knew - that Skolnick said he worked for JAMA, he did not mention the Post-Dispatch, and he contributed to the Post-Dispatch articles shortly after he ended his contact with CMS. See Wynne, 741 N.E.2d at 676; Moriarity, 732 N.E.2d at 739-40.

Moreover, the context of Yanucci's letter demonstrates that the strong language therein is mere rhetoric and hyperbole. The court must examine the language in context. Language that is loose, figurative, and exaggerated tends to be opinion rather than fact. See Gardner, 731 N.E.2d at 355 (noting that calling the plaintiff "unethical" could not be construed as stating facts, and was non-actionable opinion); Hopewell, 701 N.E.2d at 105 (noting that where a subject is controversial, harsh statements are more likely to be substanceless rhetoric). Yanucci's letter is a response to the editor of a newspaper that published articles highly critical of CMS. Skolnick identified himself to CMS as working for JAMA, and did not tell CMS that his work would also appear in the Post-Dispatch. In this context, Yanucci's statements to the effect that Skolnick was employing "tactics that have been repeatedly condemned by responsible media," misrepresented his identity, and was deliberately deceptive, dishonest, and fraudulent are rhetoric and hyperbole, not statements of fact.

17

## 2. The Tripoli Letter

The Tripoli letter is not defamatory per se. (<u>See</u> supra pp. 3-4 for the complete text of Tripoli's letter). Skolnick claims Tripoli's letter defames him by falsely accusing him of questionable reporting tactics and publishing inaccurate facts. The court addresses each in turn.

### a. Questionable Reporting Tactics:

Tripoli's assertion of questionable reporting tactics is similar to Yanucci's letter, in that it is based on Skolnick's identification of himself to CMS as working for JAMA rather than the Post-Dispatch. The court's analysis of Yanucci's letter applies here as well, and need not be repeated. (<u>See</u> supra at pp. 15-17.) The underlying facts about Skolnick's identification of himself to CMS are true, and the remainder of Tripoli's comments on the subject are non-actionable opinion. (<u>See</u> <u>id.</u>) For the same reasons that Yanucci's letter was non-actionable opinion, Tripoli's assertion that Skolnick engaged in questionable reporting tactics is not actionable. (<u>See</u> <u>id.</u>)

Skolnick also argues that Tripoli's statement that Skolnick received information from plaintiff's lawyers seeking to advance their own agenda against CMS is defamatory per se because it impugns his integrity as a journalist. Under the innocent construction rule, the court should interpret the alleged defamation in context and give the words their natural and obvious implications and meanings. <u>Bryson</u>, 672 N.E.2d at 1215. A statement is not actionable per se when the court construes it in context and finds that it could reasonably interpret it as referring to someone other than the plaintiff. <u>Id.</u> Tripoli's statement that Skolnick may have been used by unnamed plaintiff's lawyers is reasonably capable of being construed as pertaining to the lawyers rather than Skolnick. Therefore, this portion of Tripoli's letter is not actionable.

### b. Publication of Inaccurate Facts:

Skolnick claims that the Tripoli letter falsely states that Skolnick's reporting in the Post-Dispatch article was inaccurate. Defendants argue that these statements relate only to a particular setting, and are expressions of opinion. The court agrees on both points.

### i. Particular Setting:

Illinois has done away with the rule that a statement limited to a single instance or particular setting is never actionable per se. Costello, 532 N.E.2d at 795-96. Instead, the court must examine the statement in context to determine whether the statement is truly limited to a single instance or generally impugns the plaintiff's fitness for his or her occupation. Id.; Anderson, 667 N.E.2d at 1302-03. If the statement taken in context can be limited to single instance or particular setting, the court should so construe it. Anderson, 667 N.E.2d at 1302-03. In this case, Tripoli's letter plainly speaks of a particular setting, that is, Skolnick's investigation of CMS and subsequent reporting in the Post-Dispatch. The allegations that Skolnick engaged in questionable reporting tactics are limited to this setting, and there is nothing that generally impugns Skolnick's integrity as a journalist. Accordingly, Tripoli's "questionable reporting" statement is not actionable.

### ii. Expression of Opinion:

Tripoli's letter is not actionable for another reason - it expresses his opinion. The court analyzes Tripoli's letter under both the Ollman factors and the Hopewell test, which demonstrate that Tripoli's letter is opinion. The Ollman factors examine: "(1) the precision of the statement; (2) the verifiability of the statement; (3) literary context of the statement; and (4) public and social contexts of the statement." Moriarty, 732 N.E.2d at 740. Each of these factors indicates that Tripoli's letter expresses opinion. First, Tripoli's skepticism of the facts Skolnick reported in the Post-Dispatch

articles is not precise. Indeed, there is not a single reference to any specific fact reported in the Post-Dispatch articles. Rather, Tripoli asserts generally that the Post-Dispatch articles contain inaccurate facts. As such, the first Ollman factor leans in favor of non-actionable opinion.

Second, Tripoli's assertion of inaccurate facts is not readily verifiable, which is a natural consequence of the lack of precision in Tripoli's letter. To verify Tripoli's statement would require litigation of all the facts reported in the Post-Dispatch articles. This exercise is better done in the marketplace of ideas than in a defamation action. Cf. Abrams, 250 U.S. at 630 (noting that an idea's acceptance in the market is the best test of its truth, Holmes, J. dissenting); Dilworth, 75 F.3d at 309 (discussing the criticism and rough competition of the marketplace that comes with publication); Desnick v. American Broadcasting Co., 44 F.3d 1345, 1355 (7th Cir. 1995) (criticizing "tabloid-style" investigative journalism, but noting its importance in the marketplace).

Finally, the literary, public, and social contexts of Tripoli's letter demonstrate that it is a general response to public criticism rather than a dissemination of specific falsehoods about Skolnick. See Gardner, 731 N.E.2d at 355; cf. Dilworth, 75 F.3d at 309. Such a response is an opinion. In sum, all of the Ollman factors lean in favor of finding that Tripoli's letter expresses opinion, not facts.

The Hopewell test also establishes that Tripoli's letter is opinion rather than facts. The Hopewell test analyzes: (1) whether the language is precise and readily understood, bearing in mind that overly loose, figurative, rhetorical, or hyperbolic language negates the impression that the statement actually presents facts; (2) whether the general context of the statement negates the impression that the statement has factual content; and (3) whether the statement is susceptible of being objectively verified as true or false. Hopewell, 701 N.E.2d at 103-04. Again, the Tripoli

20

letter's allegations of inaccuracies in the Post-Dispatch articles are loose and generalized, rather than specific. The context of the letter, a response to public criticism, refutes the idea that Tripoli is stating false defamatory facts about Skolnick. See id. at 105 (noting that statements made in a public dispute are likely to be perceived as substanceless rhetoric). And, as discussed above, it is difficult to objectively verify whether Tripoli's assertion of inaccurate reporting is true or false.

In sum, both the Ollman and Hopewell tests demonstrate that Tripoli's allegations of inaccurate reporting in the Post-Dispatch articles represent his opinion on the subject rather than defamatory facts about Skolnick.

### 3.    The Miles Letter:

The Miles letter does not defame Skolnick. (See supra pg. 7 for the relevant portions of the Miles letter.) There are three allegedly defamatory statements in the Miles letter: (1) the letter takes issue with the Post-Dispatch articles' report of a particular inmate's death, and the report of an expert who opined that the death was the result of "criminal negligence;" (2) the letter disputes the Post-Dispatch articles' report that 12 million inmates return to society each year; and (3) the letter summarizes the Post-Dispatch articles as inaccurate and sensationalistic. Skolnick also alleges that the Miles letter contains a fourth statement (to the effect that the Post-Dispatch articles were based on biased sources that could not be independently verified), but fails to specifically cite to the portion of Miles letter that contains that allegation.[2] Because the Miles letter is lengthy, and Skolnick fails to give the court any direction, the court will not waste judicial resources scouring the record to find his evidence. See Doherty v. City of Chicago, 75 F.3d 318, 324 (7th Cir. 1996);

---

[2]Defendants cited the portions of Miles' letter that contain the first three allegedly defamatory statements. The court relied on Defendants' citation.

Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir.1994). Thus, the court only considers the three allegations of defamation outlined in this opinion. Skolnick has waived any argument on the fourth allegation.

Defendants argue that the three statements in the Miles letter are not defamatory as a matter of law because the first two do not mention Skolnick by name, and the third is an expression of opinion. Skolnick, on the other hand, argues: (1) that the letter contains indirect references to him, which makes it defamatory in these circumstances; and (2) that the letter's reference to the "reporters" of the Post-Dispatch articles is sufficient because Skolnick was one of the reporters. As explained below, the court finds nothing defamatory in the Miles letter.

Defamation allows recovery for harm to reputation. See Bryson, 672 N.E.2d at 1214; Hopewell, 701 N.E.2d at 102. The Miles letter simply presents another view of the facts reported in the Post-Dispatch articles, and comments on the general tenor of the articles. For example, the first allegedly defamatory statement states that one of the sources for the Post-Dispatch articles was an expert witness in litigation against CMS, and that his opinion was different from that of a coroner. The second allegedly defamatory statement takes issue with the Post-Dispatch report that 12 million inmates return to society each year by pointing out that there are only 1.7 million people incarcerated in the United States. These statements in no way harm Skolnick's reputation. Skolnick claims there is an inference that he failed to accurately report those facts, but that is too great a leap to support a claim for defamation per se. See Dubinsky, 708 N.E.2d at 447 (noting that defamation per se only exists if a statement is "so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary and extrinsic facts are not needed to explain it."). Like the Tripoli letter, the first and second statements from the Miles letter are disputes of fact that are

22

better sorted out in the marketplace than in a defamation action.  Cf. Abrams, 250 U.S. at 630

(Holmes, J. dissenting); Dilworth, 75 F.3d at 309; Desnick, 44 F.3d at 1355.

The third allegation of defamation from Miles' letter is highly critical of the Post-Dispatch

authors, but the statements are non-actionable opinion.  Under both the Ollman and Hopewell tests,

loose and rhetorical hyperbole is not actionable.  See Hopewell, 701 N.E.2d at 103-04; cf. Moriarty

v. Greene, 732 N.E.2d at 740.  The final paragraph of Miles' letter uses such loose, rhetorical

hyperbole.  Miles' letter states that "the reporters' thesis is flawed, their statements are inaccurate,

and the tone is sensationalistic . . . [the] articles do a terrible disservice to [those] who care for

inmate patients . . . [who are] . . . dedicated and hardworking people who do not deserve to be

vilified by reporters who disregard the truth in pursuit of journalistic accolades.  While these

healthcare professionals have been unjustly maligned, the truth is the real victim."  Imprecise

statements such as this are not capable of verification, and cannot be construed as stating defamatory

facts about Skolnick.

### III.    CONCLUSION

For the foregoing reasons, the court grants summary judgment in favor of Correctional

Medical Services, Spectrum Healthcare Services, Richard Miles, and Louis Tripoli on Plaintiff's

claims of defamation per se.  The court denies Plaintiff's motion to strike as moot.

IT IS SO ORDERED.

ENTER:    _Charles R Norgle, Sr._
CHARLES RONALD NORGLE, SR. Judge
United States District Court

DATED: _7-13-01_

23